## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
| ) | |
| Plaintiff,   ) | |
| ) | |
| vs.   ) | Case No. CR-05-107-M |
| ) | |
| ANDY NELSON KING, and   ) | |
| KRIS DEVEN YOUNGSTEDT,   ) | |
| ) | |
| Defendants.   ) | |

## ORDER

Pending before the Court is Defendant Andy Nelson King's Motion to Suppress Evidence and Statements. The Motion has been fully briefed; in addition, an evidentiary hearing was held on July 8, 2005, during which Undersheriff Tim King of Cotton County, Oklahoma testified.[1] Based on the parties' written submissions, the argument of counsel, and the evidence presented during the hearing, the Court finds that Defendant King's Motion should be denied.

I.     Factual Background

At approximately 9:00 p.m. on May 16, 2005, Undersheriff King, who was off-duty at the time, received a telephone call from Linda Green.[2] Green told Undersheriff King that she witnessed a tall Native American or Hispanic male purchasing Coleman camping fuel, about two cases of

---

[1]     The Court finds that Undersheriff King is a credible witness.

[2]     Undersheriff King has known Green for approximately ten years, presumably because her deceased husband was an Oklahoma Highway Patrol Trooper. Since her husband's death, Green has spoken publicly (with Undersheriff King on at least one occasion) about the dangers of methamphetamine, and she has advocated in favor of tighter restrictions on sales of the drug's precursors. Green communicates her observations of suspicious activity to the Cotton County Sheriff's Office on a regular basis; she is considered a reliable witness.

starting fluid,[3] and some clothing[4] at a Wal-Mart store in Wichita Falls, Texas.  She said the man

appeared nervous, that he was pacing and looking around while waiting in the check-out line.[5]

Green also said that she watched the man leave the store and get in a pick-up truck (the identifying

features of which she described to Undersheriff King), and that she observed the truck proceed

northbound on Interstate 44, toward Oklahoma.  While talking to Green on his cellular telephone,

Undersheriff King changed his clothes, got in his police cruiser, and drove to the Texas/Oklahoma

border.  Green followed the pick-up truck in her own vehicle as the truck continued North on

Interstate 44, eventually crossing the Red River into Oklahoma.

Undersheriff King waited for the pick-up truck at the intersection of Interstate 44 and

Highway 36, near mile-marker 1 on the Oklahoma side of the Interstate, all the while maintaining

telephone contact with Green.  When he finally picked out the truck that Green described,

Undersheriff King used a radar gun to measure its speed at 73 miles per hour in a 70 mile-per-hour

zone.  He immediately activated his overhead lights and initiated a traffic stop.

Once the vehicles had come to a stop, Undersheriff King approached the pick-up truck and

advised the driver, Defendant Kris Deven Youngstedt, a white male *not* matching the description

of the man observed by Green, that he stopped him for speeding.  Undersheriff King then asked

---

[3]     Green made the call because she knew that Coleman camping fuel and starting fluid
are commonly used in the manufacture of methamphetamine.

[4]     Undersheriff King testified that Green *may* have said the man was purchasing
camouflage clothing.  He later determined, after searching the suspect's vehicle, that camouflage
clothing was in fact purchased.  Undersheriff King testified that methamphetamine cooks frequently
wear camouflage clothing to avoid detection when manufacturing the drug in wooded areas.

[5]     Undersheriff King testified that Green said a Wal-Mart checker accidentally dropped
a can of starting fluid on the ground, causing some of the fluid to escape.  This event appears to have
preceded, and perhaps even caused, the man's nervous behavior.

Defendant Youngstedt to produce his license and registration, which he did, and to step out of the truck and join him in his cruiser.  Defendant Youngstedt obliged.  Undersheriff King and Defendant Youngstedt sat together in the front seat of the cruiser while the license check was performed.  The check revealed nothing out of the ordinary, prompting Undersheriff King to ask to speak to Defendant Youngstedt outside the car for safety reasons.  Standing at the rear of the cruiser, Undersheriff King asked Defendant Youngstedt about the Wal-Mart purchases.  Defendant Youngstedt claimed ignorance, stating that he did not know what his companion purchased at the store, and he orally consented to a search of his truck.  By that time, a Texas police officer arrived on the scene.  The Texas officer remained with Defendant Youngstedt as Undersheriff King approached the passenger side of the truck.

Undersheriff King opened the passenger door and directed Defendant King, who matched the description of a tall Native American or Hispanic male, to exit, which he did.  Before escorting Defendant King to his cruiser, however, Undersheriff King noticed what appeared to be a gray or black toiletry bag, inside of which was a clear plastic bag containing a "white powdery substance." The bag, having dimensions of about six to eight inches long, two inches wide, and one inch high, was plainly visible as it rested partially under a "console" in the middle of the bench-style seat of the truck.[6]  Undersheriff King seized the bag, performed a field test of its contents, which tested positive for methamphetamine, placed Defendants Youngstedt and King under arrest, and read them

---

[6]     Undersheriff King testified that the "console" could be raised, in which case it would allow for a third seat between the driver and passenger, or lowered, in which case it would separate the driver's seat from the passenger's seat.  He testified that the console was lowered when he observed the toiletry bag.  He estimates the console to be about one and one-half feet square, with about one inch of clearance between the seat and the console.

their *Miranda* rights.[7]  He then conducted a thorough search of the truck that revealed, in addition to the methamphetamine already seized, and among other things, several boxes of Sudafed (containing pseudoephedrine), a well-known methamphetamine precursor, several bottles of liquid Heet, a second methamphetamine precursor, thirteen cans of Prestone starting fluid, a third methamphetamine precursor, a gallon-size jug of Coleman camping fuel, a fourth methamphetamine precursor, tubing, which is frequently used in the manufacture of methamphetamine, a propane tank, also frequently used in the manufacture of methamphetamine, and camouflage clothing, often worn by methamphetamine cooks.

The Defendants were transported to the Cotton County Sheriff's Office where they were again advised of their *Miranda* rights and signed written waivers of those rights.  Both made incriminating statements in response to questioning.

On June 8, 2005, a federal grand jury indicted both Defendants on one charge of knowingly and intentionally possessing pseudoephedrine with knowledge that it would be used to manufacture methamphetamine in violation of 21 U.S.C. § 841(c)(2).  Defendant King was separately charged with one count of knowingly and intentionally possessing approximately 20 grams of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

Defendant King now moves the Court to suppress all evidence seized during, together with all statements and evidence that flowed from, the alleged unlawful seizure and search of Defendant Youngstedt's vehicle.  Defendant King's Motion is predicated on three arguments: (1) Undersheriff King did not have a legally justifiable basis to stop the vehicle; (2) the scope of Undersheriff King's conduct during Defendants' detention was not reasonably related to the purported basis for the stop;

---

[7]         *Miranda v. Arizona*, 384 U.S. 436 (1966).

and (3) the search of Defendant Youngstedt's vehicle was unlawful.  Each argument will be addressed in turn.

II.     Discussion

        A.      Traffic Stop

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures by the government.  U.S. Const. amend. IV; *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005).  It is well established that the protections of the Fourth Amendment "extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  *Arvizu*, 534 U.S. at 273; *Williams*, 403 F.3d at 1206.  Routine traffic stops constitute "investigative detentions," and challenges to their constitutionality are analyzed under the two-part test announced by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).  *Williams*, 403 F.3d at 1206.

Under *Terry*, the Court must first determine whether the stop was "justified at its inception," and second, "whether the officer's conduct during the detention was reasonably related in scope to the circumstances which justified the initial stop."  *Id.*  The Court begins by examining the propriety of the traffic stop that occurred in this case.

"[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc).  The fact that the officer may have had some other subjective motivation for conducting the stop is irrelevant.  *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998).  Alternatively, a traffic stop is justified under the Fourth Amendment if the stop "is supported

by reasonable suspicion to believe that criminal activity 'may be afoot' . . . ." *Arvizu*, 534 U.S. at

273; *United States v. Gama-Bastidas*, 142 F.3d 1233, 1240 n.9 (10th Cir. 1998) ("A stop of a vehicle

may be constitutional without probable cause if the officers had a reasonable suspicion, grounded

in specific and articulable facts, that the suspect has committed, is committing, or is about to commit

a crime.").   The determination as to whether reasonable suspicion exists must be based on the

"totality of the circumstances."  *Arvizu*, 534 U.S. at 273.  As explained by the Supreme Court:

> When discussing how reviewing courts should make reasonable-
> suspicion determinations, we have said repeatedly that they must look
> at the "totality of the circumstances" of each case to see whether the
> detaining officer has a "particularized and objective basis" for
> suspecting legal wrongdoing. . . . This process allows officers to draw
> on their own experience and specialized training to make inferences
> from and deductions about the cumulative information available to
> them that "might well elude an untrained person."

*Id.* (citation omitted) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).

Before assessing the constitutionality of the traffic stop at issue in this case, the Court must

initially determine what prompted the stop: was it the information that Green conveyed to

Undersheriff King?  Was it the apparent traffic (speeding) violation?  Or was it a combination of the

two?  Undersheriff King testified that although he observed Defendant Youngstedt's pick-up truck

exceeding the speed limit, he would have initiated the stop regardless of whether a traffic violation

occurred.   Undersheriff King further testified that he conducted the stop specifically because he

believed the information provided by Green gave him reasonable suspicion to do so.  Based on this

testimony, the Court finds that Green's tip was the sole underlying justification for the traffic stop.

Therefore, the stop will be deemed constitutional only if, under the totality of the circumstances,

Undersheriff King possessed reasonable, articulable suspicion that criminal activity had occurred,

6

was occurring, or was about to occur.  *Arvizu*, 534 U.S. at 273; *Gama-Bastidas*, 142 F.3d at 1240 n.9.  As explained below, the Court finds this to be an extremely close question.

The Court's reasonable-suspicion determination in this case is of necessity based on a very limited set of facts.   When Undersheriff King initiated the traffic stop, he was aware of the following: (1) a familiar and reliable witness reported that she observed an individual lawfully purchase two known methamphetamine precursors; (2) the witness said the man purchased a small amount of Coleman camping fuel[8] and a large quantity, about two cases  (which Undersheriff King estimated to be between ten and fifteen cans), of Prestone starting fluid; (3) the witness said the man appeared nervous, that he was pacing and looking around, apparently after a Wal-Mart employee dropped one of the cans of starting fluid; (4) the witness *may* have said the man purchased camouflage clothing, which Undersheriff King knew methamphetamine cooks often wear; and (5) the witness said she saw the man get in a pick-up truck and proceed northbound on Interstate 44, toward Oklahoma.

The question before the Court is whether the above-listed facts support a finding of reasonable suspicion that criminal activity has occurred, is occurring, or is about to occur.  Notably, neither party has cited the Court to any cases involving even remotely similar facts.  And the Court, through its own research, has located cases of only marginal significance.   Nevertheless, the following cases offer some guidance.

In *United States v. Townsend*, 330 F.3d 438 (6th Cir. 2003), a police officer was advised, through his radio dispatcher, that a Wal-Mart employee reported seeing two men purchase "a large

---

[8]     Undersheriff King testified that to his knowledge, Coleman camping fuel is sold only in gallon-size jugs, the same size container purchased by Defendant King and later found in Defendant Youngstedt's pick-up truck.

quantity of pseudoephedrine tablets, lithium batteries, camping fuel and other items," 330 F.3d at

439, all of which are used in the manufacture of methamphetamine.  He was given a description of

the men's vehicle and soon spotted it.  The officer also was given the name of the registered owner

of the vehicle, a name that the dispatcher said belonged to a person who had been injured in a

methamphetamine lab explosion.  *Id.*  In addition, the officer was advised that the owner's vehicle

had recently been stopped in connection with the theft of anhydrous ammonia, another ingredient

used in the manufacture of methamphetamine.  *Id.*  Based on this information, the officer stopped

the vehicle, searched it, and found methamphetamine, methamphetamine precursors, and related

drug paraphernalia.  *Id.*  The defendants moved to suppress the evidence discovered in the search,

arguing, *inter alia*, that the officer lacked reasonable suspicion to conduct the traffic stop.  *Id.* at

440-41.  The district court denied the motion and the Sixth Circuit affirmed, holding that the

officer's

> knowledge of the alleged purchase of methamphetamine precursors,
> coupled with his contemporaneous observation of a car closely
> matching the description of the vehicle linked to that purchase, in
> addition to the information regarding [the owner's] possible previous
> involvement in the illegal manufacture of methamphetamine,
> provided him with specific and articulable facts justifying the brief
> investigatory stop.

*Id.* at 441.

In *United States v. Ameling*, 328 F.3d 443 (8th Cir. 2003), *cert. denied*, 540 U.S. 961, a store

security officer witnessed two people purchase two boxes of pseudoephedrine apiece, act

suspiciously (the suspects used separate checkout lines, even though the store was not busy, left the

store separately, and met up in the parking lot), and then drive across the street to a convenience

store.  328 F.3d at 445.  The security officer called police and relayed his observations.  Police then

8

learned that the suspects purchased what was believed to be a lithium battery (but turned out to be an alkaline battery), another methamphetamine precursor, from the convenience store. *Id.* Once the subjects left the convenience store parking lot, police stopped their vehicle, searched it, and discovered methamphetamine, pseudoephedrine, an alkaline battery, hose clamps, rubber hosing, and a 20-gallon propane tank. *Id.* at 445-46. The subjects were arrested, and they subsequently moved to suppress the fruits of their allegedly unlawful seizure. The district court granted the motion, finding that police lacked reasonable suspicion to conduct the traffic stop. *Id.* at 446-447. In reversing, the Eighth Circuit noted the defendants' purchase of a significant amount of pseudoephedrine, the suspicious behavior exhibited by the defendants, and their subsequent purchase of a second methamphetamine precursor, or what police reasonably believed to be a second methamphetamine precursor at the time, from another store. *Id.* at 448. The court said that "[w]hile each individual action taken by the defendants could be susceptible to innocent explanation, their behavior must be considered as a whole and in light of the officers' 'experience and specialized training.'" *Id.* (quoting *Arvizu*, 534 U.S. at 273).

In *United States v. Araque*, 255 F. Supp. 2d 1010 (D. Neb. 2003), police received a tip from a store employee that two men attempted to purchase two gallons of iodine, a methamphetamine precursor, but declined to complete the purchase after being asked for identification. 255 F. Supp. 2d at 1011. Once apprised of the tip, police conducted surveillance of the car and its occupants, watching a female passenger enter two different drug stores and return to the car with bags. Police learned from an employee in one of the stores that the female purchased 15 boxes of cold medicine. *Id.* At that point, police stopped the car and searched it. They found various methamphetamine

9

precursors and evidence of methamphetamine use. *Id.* In denying the motion to suppress, the court

noted that

> [w]hile the tip from the [first store's] employees might not alone have been sufficiently reliable to justify an investigatory stop of the car, their information did not stand in isolation. Before approaching the car, Chief Deputy Sheriff Jenson and other officers initiated surveillance and personally observed a female occupant of the vehicle go into two drug stores and return to the car with purchases. In addition, [one officer] verified with an employee of one of those stores that the woman had purchased multiple boxes of cold medicine containing pseudoephedrine – a precursor drug for methamphetamine.

*Id.* at 1012.

In *United States v. Thurston*, No. S1402CR494CDPDDN, 2003 WL 22048031 (E.D. Mo.

May 2, 2003) (unpublished op.), a police detective personally observed the defendant purchase two

boxes of pseudoephedrine from one store and then another two boxes from a second store, *and* had

recognized the defendant from a previous methamphetamine-related arrest. 2003 WL 22048031,

at *1. The detective stopped the defendant's vehicle and conducted a search that revealed a

significant quantity of pseudoephedrine pills and other drug paraphernalia. *Id.* at *1-2. In

determining that reasonable suspicion supported the traffic stop, the district court emphasized that

the detective was experienced in methamphetamine detection, that the detective knew the defendant

had a history of involvement in methamphetamine production, and that the detective observed the

defendant purchase a significant quantity of a methamphetamine precursor from two separate

locations within a short period of time. *Id.* at *2.

In all of the above-cited cases, the courts obviously found that police had reasonable

suspicion to conduct the traffic stops, but their decisions were clearly supported by more evidence

than is present in this case. In *Townsend*, there was evidence that the police were aware the

defendants purchased methamphetamine precursors, but also knew the defendants, or at least one of them, had a history of involvement with methamphetamine. In *Ameling*, there was evidence that the police were aware of suspicious behavior in connection with the purchase of a methamphetamine precursor (pseudoephedrine), and the subsequent purchase of a second methamphetamine precursor (what was believed to be a lithium battery) from a second store within a short period of time after the first purchase. In *Araque*, there was evidence that the police were aware the defendants attempted to purchase a large quantity of a methamphetamine precursor (iodine), but suspiciously declined to complete the purchase when asked for identification, and then proceeded to purchase an additional methamphetamine precursor (pseudoephedrine) from a second store shortly after their first attempted purchase. And in *Thurston*, there was evidence that the police were aware the defendant made two purchases of a methamphetamine precursor (pseudoephedrine) from two different stores within a short period of time, and that the defendant had previously been arrested for a methamphetamine-related offense.

In a second line of cases involving slightly less evidentiary support than is involved in this case, three state courts reached differing conclusions. In *Williamson v. State*, 876 So.2d 353, 354-56 (Miss. 2004) (en banc), the court held that reasonable suspicion supported a traffic stop where the police officer initiated the stop after learning from his dispatcher only that two suspects had purchased "large quantities" of pseudoephedrine from one convenience store and had attempted to purchase pseudoephedrine from a second. *But see id.* at 361 (Graves, J., dissenting) ("Making a lawful purchase of over-the-counter medication does not create a 'reasonable suspicion, grounded in specific and articulable facts, that the suspect was involved in or is wanted in connection with a felony.'"). In a case involving facts similar to those in *Williamson*, the Indiana Supreme Court in

*State v. Bulington*, 802 N.E.2d 435 (Ind. 2004), held that under the Indiana Constitution, a traffic stop was not justified at its inception where the only basis for the stop was the two defendants' purchase of three packages of cold medicine each. The court distinguished several cases where reasonable suspicion was found, noting that "none of these cases involved an officer conducting an investigatory stop of a person based solely on information that the person legally purchased a small to moderate amount of one precursor." 802 N.E.2d at 441. Finally, in *Summers v. State*, __, S.W.3d __, 2005 WL 361722 (Ark. Ct. App. Feb. 16, 2005), the Arkansas Court of Appeals held that reasonable suspicion was lacking where a traffic stop was predicated solely on a tip that the defendant purchased a large quantity of matches, a known methamphetamine precursor.

The facts of the instant case place it somewhere between the federal cases and the state cases cited above. Unlike *Townsend* and *Thurston*, for example, there is no evidence that Undersheriff King knew of any prior criminal history for either Defendant Youngstedt or Defendant King before he initiated the traffic stop. And unlike *Ameling* and *Araque*, there is no evidence that Undersheriff King was made aware of any obviously suspicious behavior or of multiple purchases of methamphetamine precursors from multiple stores. However, unlike the three state court cases, Undersheriff King was made aware that *two* methamphetamine precursors were purchased, and that one was purchased in an unusually large quantity.

Thus, although the above cases are somewhat instructive, given their distinguishable facts, this Court's reasonable-suspicion determination must, ultimately, rest on the totality of the circumstances of this case. And in this case, two facts are critical. First, Undersheriff King was made aware that an individual purchased *two* known methamphetamine precursors. Second, he was told that the person purchased an unusually large quantity of one of the precursors. Under any

circumstances, the purchase of thirteen cans of starting fluid would be unusual, but when such a purchase is combined with the purchase of a second methamphetamine precursor, the scale begins to tip in favor of reasonable suspicion. The scale tips even further when the Court considers Undersheriff King's knowledge and experience, Green's established reliability as an informant, the suspect's purportedly suspicious behavior,[9] and the fact that Undersheriff King may have been aware that the suspect purchased camouflage clothing,[10] yet another item associated with methamphetamine production. In light of the foregoing, and bearing in mind that "[a]lthough an officer's reliance on a mere 'hunch' is insufficient to justify a stop, . . ., the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard," *Arvizu*, 534 U.S. at 274, the Court finds, not without some hesitation, that before he initiated the traffic stop, Undersheriff King had reasonable suspicion to believe that criminal activity had occurred, was occurring, or was about to occur, such that the traffic stop in this case was justified under the Fourth Amendment at its inception.

B.    Scope of Detention

Having determined that the traffic stop was justified at its inception, the Court turns to the second *Terry* factor: the scope of the detention. To resolve this issue, the Court must determine

---

[9]    The Court attributes less significance to Defendant King's behavior than it otherwise might because of the circumstances preceding it. Undersheriff King was told that the individual who turned out to be Defendant King was pacing and looking around in the check-out aisle, but this behavior appears to have occurred after and possibly because a Wal-Mart employee accidentally dropped a can of starting fluid, causing some of the fluid to escape. It is not necessarily unusual for a person to act nervously when a sudden event causes others' attention to be drawn to him in a public place. Here, Defendant King may have exhibited nervous behavior strictly because the can of starting fluid fell to the ground, creating a noise and, presumably, drawing other customers' and employees' stares in his direction.

[10]    *See supra* note 4.

13

"whether the officer's conduct during the detention was reasonably related in scope to the circumstances which justified the initial stop." *Williams*, 403 F.3d at 1206.   Under ordinary circumstances, "[t]he investigative detention . . . must 'last no longer than is necessary to effectuate the purpose of the stop,' and '[t]he scope of the detention must be carefully tailored to its underlying justification.'" *Hunnicutt*, 135 F.3d at 1349 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Here, the stop was precipitated by the information that Green communicated to Undersheriff King, namely, that an individual was observed purchasing two methamphetamine precursors, one in an unusually large quantity.   Because Undersheriff King, based on this information, along with his training and experience, had reasonable suspicion to believe that methamphetamine and/or other methamphetamine precursors could be found in Defendant Youngstedt's pick-up truck, the Court finds that he was justified in asking Defendant Youngstedt for permission to search the vehicle.   The Court further finds that Undersheriff King, after obtaining permission to search from Defendant Youngstedt, properly directed Defendant King to exit the truck, properly searched for and seized contraband from Defendant Youngstedt's pick-up truck, and properly detained Defendant King throughout.   In short, the Court finds that Undersheriff King's conduct was reasonably related in scope to the underlying and legitimate justification for the stop.

Even assuming, *arguendo*, that the purported speeding violation prompted the stop, and assuming further that Undersheriff King acted unreasonably when he asked Defendant Youngstedt for permission to search the truck, rather than simply issuing a traffic citation, *see Hunnicutt*, 135 F.3d at 1349 ("An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation."), suppression would not be warranted in this case.   To demonstrate that evidence should be suppressed as the result of an unlawful detention,

14

a defendant must prove not only that his constitutional rights were violated, but also that a factual nexus exists between the constitutional violation and discovery of the unlawfully seized contraband. *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001).   A factual nexus exists only if detention of the *defendant*, as distinguished from detention of the vehicle or the other occupants of the vehicle, was the but-for cause of the discovery.   *Id.* at 1133 (citing *United States v. Nava-Ramirez*, 210 F.3d 1128 (10th Cir. 2000)).   The Court finds that Defendant King has not made this required showing.   In other words, he has not established that *his*, and *only his*, detention gave rise to discovery of the contraband.   There has been presented no evidence that Defendant King, a passenger in Defendant Youngstedt's truck, could have lawfully driven the truck from the scene of the stop, or that Undersheriff King would not have discovered the methamphetamine and methamphetamine precursors in his search of the truck if Defendant King had otherwise been permitted to leave the scene.   Hence, even if Defendant King's detention is deemed unconstitutional, the evidence seized during the traffic stop would not be subject to suppression on the basis of Defendant King's unlawful detention alone.

    C.    <u>Vehicle Search</u>

    In addition to challenging the constitutionality of the traffic stop and his detention, Defendant King challenges the constitutionality of the vehicle search.   Defendant King, however, lacks standing to do so.   *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162 (10th Cir. 1995) ("[P]assengers lack standing to challenge vehicle searches.").   Because passengers have standing to challenge only "a constitutionally improper traffic stop, detention, or arrest on Fourth Amendment grounds," *id.* at 1164, the Court need not consider whether the search of Defendant Youngstedt's vehicle, the ownership of which is not in doubt, was constitutionally proper.   *See Gama-Bastidas*,

15

142 F.3d at 1239 (holding that a passenger has standing to challenge an allegedly unlawful search only if he has manifested a subjective expectation of privacy in the object to be searched, and if his expectation of privacy is objectively reasonable).

     D.     Arrest

Finally, the Court notes that Defendant King suggested during the hearing, but did not explicitly argue, that his arrest was in some way unlawful.  The Court finds no basis in the record for a challenge to the constitutionality of Defendant King's arrest.  The arrest occurred only after Undersheriff King confirmed the presence of methamphetamine in Defendant Youngstedt's pick-up truck, and the procedures that Undersheriff King followed in effectuating Defendant King's arrest and in obtaining oral admissions from him after his arrest appear from the evidence before the Court to be both standard and proper.  The Court, therefore, rejects any implied challenge to the propriety of Defendant King's arrest.

III.    Conclusion

For all of the above-stated reasons, the Court finds that Defendant King's Motion to Suppress Evidence and Statements [docket no. 22] should be, and now hereby is, DENIED.

     **IT IS SO ORDERED this 12th day of July, 2005.**

VICKI MILES-LaGRANGE
UNITED STATES DISTRICT JUDGE

16